## AMERICAN LAUNDRY MACHINERY CO. et al. v. PROSPERITY CO., Inc.

Circuit Court of Appeals, Second Circuit.
March 4, 1929.

Nos. 196, 197.

Charles Neave, of New York City, and B. W. Brockett and E. L. Hyde, both of Cleveland, Ohio (Maxwell Barus, of New York City, of counsel), for appellants.

Drury W. Cooper and Sturges S. Dunham, both of New York City, and Frederick G. Bodell, of Syracuse, N. Y., for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. This is a suit for infringement of patent No. 1,379,601, issued to Andree, on an application filed October 31, 1919, and granted May 24, 1921; also of patent No. 1,489,227, issued to Benjamin & Carroll, on an application filed May 13, 1918, and granted April 1, 1924. Machines made pursuant to these patents are for shaping and pressing garments, such as wearing apparel, and also for general laundry work, where heat and moisture are used. The essentials of the machine comprise a buck (an ironing board) and a head (an iron). They may or may not be co-extensive in size, but usually they are co-extensive in area. The head is heated by steam or gas. Some are power machines, where the maximum pressure is exerted by a motor or belt driven parts. Some are operated by hand or foot. They are old in the art. Of these power-driven machines, but 30 or 40 were made by the appellants under the Andree improvement patent, and 863 were made under the Benjamin & Carroll improvement patent.

Before the trial, appellants ceased making the power-driven machine. The inventions were made to meet the problem of preventing a worker's hand from being caught between the two pressing members. The mechanical contrivance made under the Andree patents makes the machine incapable of being power-closed from its normal wide-open position, in which the work is completely visible and accessible. The machine is made fool-proof, so that the operator cannot upset its cycle of operation. There is no claim of advancing the performance of the machine or making it do better work. The invention is claimed to be an improvement for safety.

Claims 6, 10, and 41 of the Andree patent, sued upon, are broad. They relate to mechanism in which the press force is applied by power, after the head has been moved by hand to a pressing position. After the work is laid in position on the buck, the head is closed by the foot or hand of the operator, so as to bring the head down upon the work to a closed position, after which the head is subjected to the effect of power means which causes it to produce final pressure upon the work. Because of the heavy power pressure, the inventor proceeds to make the machine incapable of closing the press from full open position, and, in the same operation, following through to final pressure. The operation is referred to as an initial closing and a subsequent final closing. It is claimed that this is accomplished by arranging the power-closing and the power-opening mechanism in undisturbable half cycles, so that, once initiated, the power-closing or power-opening step is compelled to advance to completion. While the power mechanism is in motion, the operator cannot interfere, either with such power mechanism or with the operator operable parts of the machine.

In a machine made under the patent, there is provided "operator operated means for producing a closing movement of the press," a foot treadle or hand-actuated mechanism for bringing the head and buck together, which is referred to as an initial closing of the press, a motor means for power source and "final pressure means operated by said motor means." This conveys the final pressure power effect. Finally there is provided means actuated by said motor means for locking the press closed during the operation of the final pressure means. This includes the devices which make it impossible to apply final pressure until an interlocking effect is produced by the initial closing of the press. With a locking effect, produced by initial closing of the press, there is a locking effect produced by actuation of the motor means, the operation of the locking means, preventing the press from being prematurely released or opened in its normal operation and from being disturbed by the operator or being interfered with until the final pressure effect has progressed to completion.

The Andree machine has a pedal which, upon depression, causes two levers to be rocked on their pivots and in turn moved a link forwardly and toward the rear, the link being connected to a joint and a toggle composed of links straightening the toggle, thereby rocking the arm or lever and bringing the pressing head down upon the buck. The head may be pulled down by hand by using a handle attached to it. Pivoted to the frame of the machine, immediately back of the foot treadle, is a swinging arm or latch, which, when the treadle of the foot lever is depressed, can be swung to the right over a stud on the back of the foot lever, thus locking the foot lever down with the head closed on the buck. Andree does not have an electric motor or an electric controlling switch for the further operation of the machine, but in the machines made by the appellants the closing of the head upon the lock automatically closes the circuit of the electric motor, whereupon the motor immediately starts.

The first operation performed by the motor is to swing a latch forward and hold it there, so as to prevent any possible release of the head until after the motor has per-

formed its first cycle; that is, has applied heavy pressure. And thus, when the machine brings the head down upon the buck, the motor first locks the machine. When the machine is locked by the motor means, the motor rotates a gear having on one side a stud extending into a peculiarly shaped cam slot in a pivoted arm, so that the stud revolves. It rocks the arm, and thereby further actuates the main toggle and applies final pressure. When the gear has made a half turn, the circuit of the motor is broken automatically by the actuating devices of an electric switch, the motor then stops, leaving the press locked under final pressure. When the operator desires to release the press, he presses the release treadle, which closes the switch again and thus starts the motor. The motor goes through its release operation or pressure-relieving cycle. In this cycle, the gear completes its rotation, and in doing so it rocks the arm back to its original position and permits the spring to open the latch, so that the press can open.

The Benjamin & Carroll patent provides, in the claims in suit, 4, 5, 6, and 15, for the Andree machine, differing only in the addition of an optional control incapable of effective or pressure-producing use while the press is open, whereby the press might be closed and immediately opened without automatically initiating the final pressure cycle, and whereby the final pressure cycle might be initiated, or not, at the will of the operator. In this combination of the patent is a "controller for special power means adapted for optional use by the operator for power pressure when the pressure is closed," and "means for preventing effective use of said controller when the press is in an open position." By effective use of the controller, it co-ordinates the Benjamin & Carroll optional controller, without Andree's idea that the final pressure effect must be susceptible of production when the press is open.

The claims in issue are said to be directed and applied to any construction in which there is a means to prevent, when the press is open, any manipulation of the controller which will produce this useful effect. They provide for "automatic means for maintaining said controller in step with the normal operation of the press and ready for the next power operation." This is a means for co-ordinating the Benjamin & Carroll optional control with the Andree machine, so that in the normal operation of the press it is automatically cocked and ready for use when the press has been normally closed to apply the final pressure, and, when the final pressure has been applied, the press is cocked to release pressure. The operator control is brought about by mechanism added to the Andree machine to produce power operation at a particular point. In the Andree cycle, after the press has been closed by hand, it prevents effective use of the controller when the press is open, and by enabling the Andree machine to function at the proper time when the press is closed. An optional control switch is placed in the circuit beyond the main line switch, tied in with the timing switch and the motor, and is mechanically actuated by a small lever operated by the operator. The prevention of effective use is secured when the plunger switch is omitted by the organization of the controller with the toggles or jackknife strut at the back of the machine, as well as other interlocks.

We do not think the appellee's machine infringes the patent in suit, and it becomes necessary only to consider the prior art, with a view of ascertaining the scope we should place on the claims, which, at best, cover narrow improvements in a crowded art. Wayne Mfg. Co. v. Benbow-Brammer Mfg. Co. (C. C. A.) 168 F. 271, Tostevin-Cottie Mfg. Co. v. M. Ettinger Co., Inc. (C. C. A.) 254 F. 434. Coextensive head and buck, with the heads mounted to swing up and down, as in the patent in suit, were old, as shown in Smith, No. 1,007,148, and Cooper, No. 1,-125,968. Initial closing of the press by the operator, followed by optional final pressure, is shown in the Betz patent, No. 1,089,385, and the Tarbox patent, No. 880,934.

In the Betz press the operator pulls the head down on the buck by means of a handle. This pushes a rod pivoted on the rear end of a lever, on which the head is mounted, and brings the lower notch in the front edge of the rod at the bottom, up to the lever of the upper end of a panel pivoted on the rear end of the foot lever. As long as the foot lever is held up by the spring, the tail of a pawl is in contact with the bracket immediately below, and the upper end of the pawl is thereby held out of engagement with the notch, and when, with the head down on the buck, the operator depresses the foot lever, the pawl is raised and the inclined edge of the bracket allows the pawl to swing over and under the notch. Further pressure on the lever pushes the rod upwardly and presses the head down hard on the buck. When the operator takes his foot off the lever, the latter is raised by a spring, whereby the tail of the pawl comes down on the bracket and swings the pawl out of the notch. The press is then opened by a common counterweight

on the push rod. After the operator has drawn the head down on the rock, he can let it swing up again, if he desires, for the purpose of examining the work or arranging it before giving the final pressure.

In the appellee's machine, the final pressure is produced by the electric motor, instead of by the operator's foot. The two machines are in material respects the same. In the appellee's machine, a lever by which the final pressure is exerted can be rocked by the motor-driven cam, without operating the head, or affecting the head in any way, unless the head is first drawn down on the buck by the operator, just as in Betz. The head of the appellee's machine can be brought down upon the work and permitted to rise again for access to the work without final pressure being exerted, unless with the head down the operator throws in the half revolution clutch, and so causes the motor-driven cam to depress the lever. It is just as in the Betz machine, where the head can be raised and lowered as often as desired without producing final pressure, unless with the head down the operator intentionally presses down with his foot on the lever.

Thus it was old in the art to produce final pressure by power prior to the invention in suit. There may be invention in a particular way or means for applying the power to a pressing machine, but not in the idea of using power.

The machine constructed pursuant to the Kouyoumjian patent, No. 1,024,483, can be operated in both ways, with the power applied automatically after the iron has been depressed by the operator, or with power pressure, at the option of the operator, after it has brought the iron down on the work. The operator can, after he has closed the press by foot pressure on the treadle, throw on the power and produce final heavy pressure, and he can, by lifting his foot, permit the head to rise again. In the Baujard patent, No. 1,070,318, a machine is described in which the power-pressing member must be brought down on the body by the operator, after which application of power pressure follows automatically. As the patent says: "The hydraulic press enters into action only at the end of the descending movement."

█ The Kouyoumjian patentee has the right to use his invention for every purpose in every way, without reference to a late comer, like the patentees of the patents in suit. A later inventor may obtain a patent on an improvement, but he has a narrow patent on the improvement, and may not make claim to a basic patent, covering broadly all means for obtaining the same or a similar result. An improvement patent must leave the way open for others to obtain the same result by other means. The Benjamin & Connor patent added the so-called optional control, but they monopolize only the mechanism or thing which they have added, and not the function of the thing.

Cooper, in his patent No. 1,125,968, presents a press different in type, but involving the stationary and movable elements of all presses. The two members, which normally have wide separations between them, are adapted to be brought into engagement with the work, and therefore to be brought into line and a power device capable of actual optional operation to apply powerful pressure between the pressing members. The pressing members cannot be brought into engagement during their entire movement by the power alone, but the power has to succeed a manual operation, and the patent provides a lock device, which prevents the operation of the power, unless the two press members are brought into close neighboring relation.

The Ecker patent, No. 818,753, shows a quarter revolution clutch. The appellee's machine uses the half revolution clutch. Ecker used a cam which had two high and two low parts, which, if it had a single high part and a single low part, would produce the half revolution.

The Freedman patent, No. 1,141,181, shows the half revolution clutch. The operations are controlled by the operator through the medium of a lever. After the press is opened, the operator can swing the lever back again up to its rightward position in order to start the press. When he has done this, the first thing that the machine does is to bring the segment or finger into the engagement with the lug on the arm. This arm is rigidly connected to the control lever, so that, when the parts are in position, the control lever is locked, with the result that the operator cannot throw the lever back into the opening position, but, on the contrary, he must leave it in the closing position until the machine has completed its pressure applying cycle. When this cycle is completed, the segment rotating with the shaft on which the driving gear is mounted is carried out of the path of the lug, and the operator may then, whenever he chooses, throw the control lever over the opening position, whereupon the half revolution clutch is thrown in again and the machine opens.

The appellee's machine has a half revolution clutch for transmitting power from the driving motor to the cam, which rocks the

heavy lever at the bottom of the machine. In the first half revolution, the cam roller is depressed and rocks the forward end of the lever downwardly, and so applies the power pressure, and the clutch then throws out leaving the motor running. In the second half revolution, which is initiated by the operator again depressing the control button, the cam is again connected to the constantly running motor, and is carried up to its first position, thereby permitting the head to swing up and down from the buck, after which the clutch is thrown out again.

The argument for infringement of the Andree patent in suit is that there is a first lock, which prevents the head from flying up while power pressure is being applied; that there is the second lock, for maintaining a cycle, and consists of a cam and arm, a pad, rod, and hook, and its co-operating members on the release treadle; and it is argued that the appellee's machine has two locks, which correspond to the first lock of the Andree patent. It is said that it also has a second lock, consisting of the cam roller and the other parts and a half revolution clutch. In the appellee's machine there is a notch and pawl which enable the lever to raise the push rod and so force the head down firmly on the buck, much as is done under the Betz patent. The only difference between the appellee's machine and the Betz machine is that in the Betz the final power is applied manually, while in the appellee's machine the final power is applied by a half revolution cam. The power applied by the treadle does not close the press, but the press has to be closed by hand, and is provided with the same safety arrangement in the Betz as in the appellee's device. While the motor is rotating the cam roller, and thereby is pressing the head down on the work, the operator cannot lift the head by pulling upwardly on it, but this is because he does not possess enough power to overcome the power of the motor. 'The motor is pressing down on the power lever. The appellee's half revolution clutch is not a lock, for what it does is to connect and disconnect the motor to and from the roller cam. When the roller cam is in its down position, the operator cannot lift the head. The same is true of the Ecker machine.

 The appellants argue that the "undisturbability" is due to the Andree locking means, parts which constitute the "controlling mechanism" for the electric switch mechanism by which, when the press is closed, the electric circuit of the motor is closed, and kept closed, the motor running until the motor is stopped. The two locks and other functions are distinguished by the appellants' expert, who says that the machine of both patents in suit provide mechanisms including two locks, one to prevent the head from flying open or the toggles from breaking when power is being applied, and the other to prevent disturbance by the operator of the machine's cycle during the application of power for its release. The appellee's machine has no release treadle; no hook to set anything in position for actuation by a release treadle; no bell crank lever to close the switch; no electric switch, that must be closed and opened to control the cycle of the machine. In its machine, the motor runs continuously. The half revolution clutch is provided to connect constantly running motor to the cam which rocks the lever, and to disconnect the motor from the cam, and a button is provided to control the half revolution clutch. They differ in operation. The result may be the same, in that the power pressure is applied and relieved under the control of the operator.

But identity of result is not the sole test of infringement, for with identity of result must go identity of means and mode of operation. Stoehrer & Pratt Dodgem v. Lusse. Bros. (C. C. A.) 7 F.(2d) 87. These patents are not entitled to a range of equivalents which would include the different instrumentalities and mode of operation used in appellee's machine. None of the claims require that the pressing members must be closed by the operator before final pressure means can be set in operation, but they are broad enough in their terms to include a machine in which the pressing members may be closed, either by power or by the operator. In view of the state of the prior art, appellants cannot be granted such a range of equivalents. It will receive a narrow interpretation and be limited in its validity to claims constituting an improvement on the prior art. Morley Sewing Machine Co. v. Lancaster, 129 U. S. 263, 9 S. Ct. 299, 32 L. Ed. 715; Greene v. Buckley (C. C. A.) 135 F. 520.

Limiting the Benjamin & Carroll patent, as we are required to do, there is nothing in the optional control means which appellee infringes. The appellee's machine has no tumbler switch. Its optional control does not in any way affect the motor, whereas, in the patents in suit, the motor is started by the operator both to apply and relieve power pressure. The claims of this patent all include means for keeping the controller in step with the rest of the press and ready for the next pressing operation, so that by no possibility whatever can the operator set the power mechanism in operation when the press

is open. In the appellee's machine, the operator can, at any time, with the press wide open or part way open, throw the half revolution clutch into action, and thus cause the power means to operate it, and if he does so the controller will immediately be put out of step, and he must again put the power mechanism through its cycle before another power pressure operation can be performed. The appellants' claims in both patents sued on may not be read so as to cover the construction or operation of the appellee's machine.

Decree affirmed.